# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 10, 2024

Lyle W. Cayce
Clerk

—————————

No. 23-50530

—————————

Century Surety Company, *as Subrogee of Triangle Engineering, L.P.*,

*Plaintiff—Appellant*,

*versus*

Colgate Operating, L.L.C.,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:22-CV-115

———————————————————————

Before Jones and Douglas, *Circuit Judges*, and Doughty[*], *District Judge*.

Edith H. Jones, *Circuit Judge*:

This case involves a dispute between an insurer, acting as a subrogee of an oilfield consultancy, and an oil well operator about the interpretation of a Master Services/Sales Agreement ("MSA") and the operator's insurance policies. Although we agree with the result the district court reached, we disagree with some of its reasoning. Thus, we AFFIRM the district court's

———————————

[*] Chief United States District Judge for the Western District of Louisiana, sitting by designation.

judgment granting summary judgment to the Defendants-Appellees on other grounds.

## BACKGROUND

The underlying facts are straightforward and not in dispute. Colgate, an oil well operator, and Triangle Engineering, L.P., an oilfield consultancy, entered into Colgate's form Master Services/Sales Agreement ("MSA") in April 2017. Century and Colgate agree that the MSA is governed by Texas law and that the Texas Oilfield Anti-Indemnity Act ("TOAIA") apply to the MSA and the underlying dispute.

The MSA contains a mutual indemnity provision that requires Colgate and Triangle to indemnify each other for any claims "arising out of, resulting from, or in any way incidental to, directly or indirectly, transactions subject to this agreement." The MSA also contains an agreement in writing that Colgate and Triangle would support their mutual indemnity obligations with liability insurance. Specifically, the MSA required Colgate and Triangle to purchase indemnity insurance with limits the lesser of (1) "not less than $5 million", or (2) "the maximum amount which may be required by law, if any, without rendering this mutual indemnification obligation void, unenforceable or otherwise inoperative."

These two provisions of the MSA are consistent with the TOAIA. As the district court explained, the Texas Legislature originally passed TOAIA in 1973 because of concerns about oil well operators shifting liability onto their contractors through one-sided indemnification agreements. *See Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 348 (Tex. 2000) (Owen, J.). These pre-1973 agreements shifted the operator's personal liability exposure onto the backs of their contractors who often lacked the funds or access to insurance policies to cover such claims. *See id.* TOAIA outlawed such one-sided indemnity agreements, which the Legislature

viewed as unfair to contractors, but it expressly authorized operators and contractors to enter into mutual indemnification agreements that were supported by liability insurance. *Id*. *See* TEX. CIV. PRAC. & REM. CODE. § § 127.002(a), .005(b).

Colgate and Triangle both purchased insurance to support their mutual indemnity obligations; however, Colgate, the operator, purchased substantially more insurance than Triangle. Colgate purchased a $1 million general liability insurance policy and a $75 million excess liability policy from Markel International Insurance, while Triangle purchased a $1 million general liability insurance policy from Hallmark and a $5 million excess liability from Century. At the time of the worker's accident relevant to this case, Colgate's Markel policies were effective September 1, 2019 to September 1, 2020, and thus had been negotiated and agreed to by Colgate several years *after* the signing of the MSA.

Colgate hired Triangle to provide a "workover consultant to coordinate the installation of an electronic submersible pump" into a well operated by Colgate in Pecos County, Texas. Triangle provided Brian Bell, who coordinated with Colgate's other contractors to install the pump. In February 2020, Jeremy Miller, an employee of one of those contractors, was crushed and injured by a pipe rack that he and Bell were unloading from a tractor-trailer. In April 2020, Miller and his wife sued several Colgate entities, Triangle, Bell, and two other contractors in Texas state court. Markel then retained counsel to defend Colgate in connection with the Miller lawsuit and underlying accident.

Triangle, and its insurers Hallmark National Insurance Company and Century Surety, settled with the Millers for an undisclosed total. Hallmark paid $1 million, and Century paid $5 million pursuant to Triangle's policies, while Markel paid $6 million into the settlement for the benefit of Triangle

and Triangle's consultant, Brian Bell. Century, as Triangle's subrogee, then sued Colgate for breach of contract for failure to indemnify Triangle, seeking reimbursement for the $5 million it paid towards the Miller settlement.

The parties filed cross-motions for summary judgment based on a joint stipulation of facts. The district court granted summary judgment for Colgate as the Defendant. First, the district court rejected Colgate's attempt to have affidavits from Colgate's vice president and general counsel, John Bell, and Triangle's sole member and operator, Brian Davis, considered as summary judgment evidence for determining Colgate and Triangle's intentions at the time they signed the MSA. The district court then concluded that while the MSA provided a "floor" for the insurance coverage the parties could seek for mutual indemnity purposes, it did not provide a ceiling. Nor did the district court identify a "ceiling" in Colgate's insurance policies. Due to this, the district court concluded that the "lowest common denominator rule" from the Texas Supreme Court's *Ken Petroleum* decision applied.

Under *Ken Petroleum*, "[w]hen the parties agree to provide differing amounts of coverage, the mutual indemnity obligations are limited to the lower amount of insurance." 24 S.W.3d at 351. The district court concluded that *Ken Petroleum's* lowest common denominator rule continued to apply despite the fact that it relied on a prior version of the statute. The relevant provision interpreted by *Ken Petroleum* stated "a mutual indemnity obligation . . . [was] limited to the extent of the coverage and dollar limits of insurance . . . each party as indemnitor . . . agreed *to provide in equal amounts to the other party as indemnitee.*" *See id.* at 349; Act of May 27, 1989, 71st Leg., R.S., ch. 1102, § 3, 1989 Tex. Gen. Laws 4557-8, *amended by* Act of April 9, 1991, 72nd Leg., R.S., ch. 36, § 3, 1991 Tex. Gen. Laws 430, 431. In contrast, the current version of the statute (which is applicable to the MSA), limits mutual indemnity obligations to the amount of coverage that "each party as

4

indemnitor has agreed to *obtain for the benefit of the other party as indemnitee.*" *See* TEX. CIV. PRAC. & REM. CODE. § 127.005(b) (emphasis added). As the district court also noted, the Fifth Circuit has previously declined to opine on how this change in statutory language would impact *Ken Petroleum*'s analysis, leaving that "question for Texas courts to answer in the first instance." *Cimarex Energy Co. v. CP Well Testing*, 26 F.4th 683, 689 n.4 (5th Cir. 2022).

Having concluded that the lowest common denominator rule applies—consistent with other district courts in the Fifth Circuit—the district court ruled that TOAIA limited Colgate's indemnity obligation to $6 million: the amount of coverage Triangle purchased to satisfy its indemnity obligations under the MSA. Century timely appealed.

## STANDARD OF REVIEW

The court reviews district court judgment rendered on cross-motions for summary judgment de novo. *See First Colony Life Ins. Co. v. Sanford*, 55 F.3d 177, 180 (5th Cir. 2009). "On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 327 (5th Cir. 2023) (citation omitted). Because the district court granted Colgate's motion, on review, this Court takes Century's evidence as true and construes all facts and justifiable inferences in the light most favorable to Century. *Id.* Any reasonable doubts must be resolved in Century's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We can affirm a summary judgment for any reason supported by the record and presented to

the district court, even if the district court did not rely on that reason. *AIG Specialty Ins. Co. v. Tesoro Corp.*, 840 F.3d 205, 209 (5th Cir. 2016).

## DISCUSSION

Based on careful review of the parties' pleadings and oral argument presentations, we conclude that the district court did not err in refusing to admit the extrinsic evidence proffered by Colgate. But we also hold that the district court erred in concluding that Colgate's insurance policies did not provide a ceiling. Instead, we agree with Colgate that its policies provided both a floor and a ceiling of $5 million. As such, we do not need to decide the applicability of *Ken Petroleum* to this case, and we conclude that Colgate is not liable to Century.

### A. Bell and Davis Affidavits

As a threshold matter, the parties spar over whether the district court erred in declining to admit affidavits from Bell and Davis, both of which state that at the time Triangle and Colgate entered into the MSA, there was no intention for either to purchase more than $5 million to fulfil their mutual indemnity obligations. The district court did not analyze this question in-depth. Instead, it cursorily concluded that it was "unconvinced that the parties have met their independent burdens such that summary judgment is unwarranted. Moreover, the Texas courts provide a ready mechanism for determining Colgate and Triangle's obligations in disputes like this one."

Colgate argues (without citation) that the district court opened the door to the consideration of extrinsic evidence when it found the amount of insurance required by the MSA between Colgate and Triangle was nonspecific. But that argument is not consistent with binding Supreme Court of Texas precedent. As the Supreme Court of Texas has held:

> [T]he parol evidence rule prohibits extrinsic evidence of subjective intent that alters a contract's terms but "does not

prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." Thus, extrinsic evidence may be consulted to give meaning to the phrase "the green house on Pecan Street," but "cannot be used to show the parties' motives or intentions apart from" the language employed in the contract.

*URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 767 (Tex. 2018). Applied here, the Texas parol evidence rule would only allow for the admission of extrinsic evidence to determine the meaning of the following phrase from the MSA: "the maximum amount which may be required by law, if any, without rendering this mutual indemnification obligation void, unenforceable or otherwise inoperative." But any latent ambiguity in the text of the MSA would not be determinative in this case. The inclusion of this phrase appears to ensure that the agreement between the parties would not be rendered "void, unenforceable, or otherwise inoperative" if the Legislature made any major changes to TOAIA (or other potentially relevant statutes), as it has in the past. As such, the district court correctly refused to consider these affidavits.

### B. Interpretation of the MSA and Colgate's Insurance Policies

As noted above, the MSA required Colgate and Triangle to purchase indemnity insurance with limits the lesser of (1) "not less than $5 million," or (2) "the maximum amount which may be required by law, if any, without rendering this mutual indemnification obligation void, unenforceable or otherwise inoperative." As the district court correctly determined, and as the parties do not dispute, the "not less than" language establishes a "floor" of $5 million of mutual indemnity coverage. The parties do dispute, however, whether the MSA, on its face, provides a "ceiling" to mutual indemnity coverage. The district court concluded that there was "no

language in the MSA to support a 'ceiling'," and thus turned to the terms of the insurance policies in search of a cognizable limit.

After careful consideration of the parties' arguments, we agree with Colgate and respectfully disagree with the district court: the only amount of insurance *required* by the MSA was $5 million, which served as both a floor and a ceiling. The only amount of insurance expressly required by the MSA was $5 million, as the words "not less than" stated a *required* minimum, and the MSA did not provide a clear maximum.

At oral argument, Century suggested that this argument transforms the MSA's language regarding "the maximum amount which may be required by law, if any, without rendering this mutual indemnification obligation void, unenforceable or otherwise inoperative" into mere surplusage. We disagree. Once the parties agreed, under the terms of the MSA, to mutually indemnify each other for the same amount, there was no risk of their MSA being invalidated under the terms of TOAIA. "Once an agreement falls within the statute's exception, there is no language in the TOAIA which would retroactively void the agreement." *Nabors Corp. Services, Inc. v. Northfield Ins. Co.*, 132 S.W.3d 90, 97 (Tex. App.—Houston [14th Dist.] 2004, no pet.) Because of this clear language in the MSA, this court does not need to look to the terms of the insurance policies or inquire into the possible application of *Ken Petroleum*.

Nor would it be appropriate for this court to look to Colgate's insurance policies in this case. Colgate's policy governs the relationship between it and Markel, its insurer; that policy does not provide any rights to Triangle, much less Century, as Triangle's insurer/subrogee. As in *Cimarex*, the MSA allowed Colgate "to obtain additional coverage for its own purposes; nothing required it to obtain its agreed indemnification coverage via a separate policy from coverage it sought for its own interests." 26 F.4th

at 690. "In TOAIA's terminology, the remaining $[71] million of [Colgate]'s excess liability coverage was not obtained for the benefit of [Triangle.]" *Id.* "[I]rrespective of the additional coverage, [Colgate's] excess liability policy fulfilled both the terms of the MSA and the requirements of TOAIA, to the extent that [Colgate] and [Triangle] were mutually indemnified up to $[5] million, coincident with [Colgate's] minimum requirements under the MSA." *Id.*

Triangle's only rights exist within the MSA, and indemnification under the MSA is not the same as insurance coverage that Colgate purchased for Triangle's benefit under the Markel policy. Indeed, any benefits for Triangle would flow through Colgate as the beneficiary of the Markel policy. *Hence, Triangle has no rights for indemnity under the terms of the policy itself*, and Colgate is under no obligation to pay any more than the $5 million it agreed to pay under the MSA.

At heart, Century's position assumes that Colgate set out a $76 million dollar indemnity obligation without clearly saying so in the contract by virtue of policies that Colgate acquired years after it had entered into the MSA. That distinguishes this case from *Cimarex*, where the MSA spelled out discrete and distinct dollar amounts of insurance that the two parties were required to obtain: One party had to obtain $1 million in general liability insurance and $2 million in umbrella or excess coverage, while the other had to obtain $1 million in general liability insurance and $25 million in excess coverage. *Id.* at 686. Hence, the *Cimarex* MSA, on its face, only set a floor for the amount of coverage the parties were required to obtain, without clearly setting a ceiling. *Id.* at 688. That is not the case here, where the only amount mentioned at all, which applies equally to both parties, is $5 million. The parties in this could have written a more precise MSA, given that *Ken Petroleum* and TOAIA amendments were almost two decades old at the time they entered into the MSA. But they chose not to do that, instead only

No. 23-50530

referencing $5 million in the MSA and inserting a second clause that would ensure the validity of their agreement if the Legislature amended the law again.

AFFIRMED.